**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| ANNE J. W.,[1] | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, COMMISSIONER | : | |
| OF SOCIAL SECURITY,[2] | : | No. 22-00448 |
| Defendant. | : | |
| | : | |

_____

<u>**MEMORANDUM OPINION**</u>

**PAMELA A. CARLOS**
**U.S. MAGISTRATE JUDGE**                                    **September 10, 2024**

Plaintiff Anne J. W. appeals the Commissioner of Social Security's final decision to deny her claim for benefits. Plaintiff alleged disability due to several conditions, including "profound fatigue" for which she sought extensive treatment throughout the country and which she contends is well-documented in the medical record. Despite this, Plaintiff argues that the Administrative Law Judge ("ALJ") found that her post-traumatic stress disorder and depression are her *only* severe impairments and completely neglected to address her generalized fatigue disorder in the resulting Residual Functional Capacity ("RFC") analysis. According to Plaintiff, the ALJ's RFC determination included no physical limitations whatsoever. Given this, Plaintiff maintains that it is impossible to know whether the ALJ even considered her fatigue diagnosis when analyzing her

---

[1]    In accordance with the Court's recent standing order on party identification in social security cases, I have referred to the plaintiff solely by her first name and last initial. *See* Standing Order, *In re: Party Identification in Social Security Cases* (E.D. Pa. June 10, 2024), https://www.paed.uscourts.gov/sites/paed/files/documents/locrules/standord/SO_pty-id-ss.pdf.

[2]    Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

functional limitations, thus warranting remand. Plaintiff also argues that the ALJ failed to properly analyze both the medical opinion evidence of record and Plaintiff's own self-described limitations.

The Commissioner disagrees arguing that Plaintiff failed to meet her burden of showing that she was unable to perform any jobs within the national economy. According to the Commissioner, substantial evidence supports the ALJ's finding that Plaintiff remained capable of performing a full range of work at all exertional levels, though with several restrictions that accounted for her fatigue and physical/mental capabilities. More specifically, the Commissioner argued that the ALJ's findings are supported by both the objective medical evidence, and Plaintiff's ability to care for her dogs, shop, prepare meals, and engage in other activities of daily living. According to the Commissioner, the ALJ properly observed that these activities are inconsistent with a finding of disability.

But the Commissioner mischaracterizes the evidence. A close review of the record confirms that Plaintiff's treating providers, the Agency's own consultative examiner, and several state agency consultants all describe more significant and detailed physical limitations than those accounted for by the ALJ in his RFC determination. Moreover, Plaintiff herself consistently reported to her providers and to the Agency that she had significant work-related limitations due to her fatigue and cognitive decline.  Nevertheless, the ALJ repeatedly cited to Plaintiff's activities of daily living to discount the medical opinion evidence of record and to discredit Plaintiff's subjective allegations related to her fatigue. However, it is apparent that the ALJ selectively cited facts that support his conclusion while ignoring those that do not. Federal courts in this district, and across the country, recognize that an ALJ is entitled to accept some evidence and to reject other evidence *with proper reason*. But an ALJ is *not* entitled to "cherry pick" favorable evidence and ignore facts that run counter to his findings. As Plaintiff correctly observed, the ALJ's singling

out of broad activities, while ignoring specific limitations in performing them, deprives the Court of meaningful review of the Decision. This is particularly problematic here, where the ALJ so heavily relied on these observations to discount the opinions of several medical providers. Given this, and as explained more fully below, I will grant Plaintiff's request for review and remand this matter for further proceedings in accordance with this opinion.

## I.   BACKGROUND

### A.   Procedural History

In 2019 Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of August 31, 2018. R.15. She was 58 years old as of the alleged onset date, and thus she was considered an individual of "advanced age." R.26. However, as of the ALJ's Decision, Plaintiff subsequently shifted age categories to that of an individual "approaching retirement age." R.26 (citing 20 C.F.R. § 404.1563). She has a high school education and past work as a nurse midwife. R.26.

Her claim was initially denied on December 12, 2019, *see* R.106-110, and again upon reconsideration on June 25, 2020. *See* R.112-114. Plaintiff then requested a hearing before an ALJ, *see* R.115-116, and a hearing was held on February 2, 2021, *see* R.35-59 ("hearing transcript").[3] The ALJ issued a written decision on February 10, 2021 denying Plaintiff's claim. R.12-34 ("ALJ Decision"). The Appeals Council denied Plaintiff's subsequent request for review, meaning the ALJ's written opinion became the final decision of the Commissioner. *See* R.1-6. Plaintiff now timely appeals.[4]

---

[3]    The ALJ attempted to hold a telephone hearing on October 27, 2020, but due to audio technical issues, the hearing was rescheduled. R.15.

[4]    The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C § 636(c). *See* ECF Doc. No. 4.

B.     The Medical Opinion Evidence.

The Administrative Record before the ALJ consisted of several medical opinions, including from Plaintiff's treating providers, state and federal agency consultants, and providers who reviewed Plaintiff's file from her long-term disability insurer.

On January 31, 2019, Plaintiff's primary care provider, Christine Stabler, M.D., submitted an attending physician's statement regarding Plaintiff's condition. R.1289-1294. Dr. Stabler observed that Plaintiff was well groomed, cooperative, and had logical/coherent thought processes. R.1291. However, Plaintiff had "halted" speech, and impaired attention, concentration, and memory. R.1291. Dr. Stabler recommended that Plaintiff stop working, citing her impaired decision-making, her inability to respond to emergencies, and her excessive fatigue. R.1292. Dr. Stabler further observed several limitations in Plaintiff's activity ability, noting that she could occasionally (i.e., only up to 2.5 hours) kneel/crouch, climb, balance, and lift up to 10 pounds.

In a follow-up report dated July 10, 2020, Dr. Stabler largely repeated the limitations provided in her earlier statement. R.1133-1134. For example, Dr. Stabler observed that Plaintiff's "fatigue prohibits extended activity of any kind," and that Plaintiff "may be most active [for the] first 3-4 hrs [sic] of the day." R.1134. Several laboratory tests also revealed positive ANA,[5] and an MRI revealed mild loss of volume in the brain. R.1133.

Finally, Dr. Stabler submitted a physical capacities evaluation on September 11, 2020, which documented several limitations. R.1295-1297. For example, Dr. Stabler opined that Plaintiff can only occasionally lift up to 10 pounds, sit for four hours, stand for two hours, and walk for less than one hour. R.1295-1296.

---

[5]     A positive result on an ANA test can be indicative of an autoimmune disease, but is not necessarily conclusive. *See ANA Test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ana-test/about/pac-20385204 (accessed on Aug. 21, 2024).

Plaintiff's treating psychiatric nurse practitioner, Deborah K. Hartman, CRNP, also submitted several statements concerning Plaintiff's health concerns. In her first report, on March 5, 2020, Nurse Hartman—like Dr. Stabler—observed that Plaintiff was well-groomed, cooperative, and exhibited logical/coherent thought processes. R.1176. But again, like Dr. Stabler, Nurse Hartman reported that Plaintiff had "halted" speech, and impaired attention, concentration, and memory. R.1176. Nurse Hartman also recommended that Plaintiff stop working due to her cognition-concentration, memory, and energy limitations. R.1177. Indeed, Nurse Hartman explained that Plaintiff is "certainly not capable of previous work as [a] midwife," and that her "energy deficits preclude other work." R.1177.

In her second report dated January 11, 2021, Nurse Hartman identified several "marked" limitations, including Plaintiff's ability to make judgments on simple work-related decisions, to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. R.1320. Nurse Hartman noted only "mild" limitations in Plaintiff's ability to interact appropriately with the public, her supervisor, and her co-workers. R.1231. Nurse Hartman explained that one of Plaintiff's "most troublesome symptoms is fatigue that has not been relieved with stimulants." R.1321.

Finally, Plaintiff's treating therapist, Karen Ramsey, MSN, submitted a report dated March 7, 2019. R.1282-1284. At the time, Nurse Ramsey noted that Plaintiff's "energy level is extremely low," but was "unsure if this is due to psychiatric or physical illness." R.1283. Nurse Ramsey explained that she suspected a "physical problem as [Plaintiff] does not have depressed mood at this time, but low energy." R.1283. Indeed, Nurse Ramsey noted that Plaintiff "verbalizes much frustration with her limitations," and "wants very much to work." R.1283-1284. Nurse Ramsey

also explained that Plaintiff is unable to do housework or cook at her previous level of functioning. R.1283.

At the request of the Social Security Administration, Plaintiff underwent a consultative examination on October 22, 2019 conducted by Ahmed Kneifati, M.D. R.783-792. Dr. Kneifati observed that Plaintiff cooks two to three times a week, shops once a week, and showers and dresses daily. R.784. He further observed that Plaintiff appeared to be in no acute distress, she had a normal gait, and she did not need help getting on and off the exam table. R.785. Dr. Kneifati observed that Plaintiff had several diagnoses including, among other things, diabetes mellitus, generalized fatigue, continuous headache, immune system disease with joint and hip pain, and short-term memory loss. R.786. He opined that Plaintiff can only occasionally lift/carry 11 to 20 pounds and can only walk for one hour without interruption R.787-788.

The Administrative Record also includes several opinions from state agency psychological consultants John Gavazzi, PsyD and Thomas E. Fink, PhD. Dr. Gavazzi's review of the medical record, which was completed in November 2019, concluded that Plaintiff had moderate limitations in the ability to understand, remember, or apply information and in the ability to concentrate, persist, or maintain pace. R.71. However, he reported only mild limitations in the ability to interact with others and to adapt or manage oneself. R.71. Dr. Fink's assessment in June 2020 reached the same conclusions. R.90.

State agency medical consultants, Josie Henderson, M.D., and David Paul Clark, M.D., also provided opinions in December 2019 and June 2020, respectively. After reviewing the medical record, Dr. Henderson opined that Plaintiff had exertional limitations, which included the ability to occasionally lift and/or carry up to 50 pounds and to stand and/or walk (with normal

breaks) for about 6 hours in an 8-hour workday. R.73-74. Dr. Paul reached the same conclusions. R. 92

The record also includes the April 2019 statements from Reginald Givens, M.D., and Shannon R. Blackmer, M.D., who both reviewed Plaintiff's file for her long-term disability insurer. Dr. Blackmer opined that Plaintiff could occasionally lift/carry/push/pull up to 20 pounds, and can frequently lift/carry/push/pull up to 10 pounds. R.1243. She opined that with these limitations, Plaintiff can work eight hours per day, five days a week. R.1243. Dr. Givens, by contrast, disagreed with several of Plaintiff's treating providers, including Nurse Ramsey, and opined that Plaintiff "lacked mental status abnormalities or behavioral observations to a degree that would support impairment from a psychiatric perspective." R.1249.

Finally, Kathleen Ledermann, PsyD performed a mental status consultative examination on Plaintiff, and provided an October 2019 statement regarding her findings. Dr. Ledermann noted that Plaintiff was appropriately dressed and groomed, and her thoughts were coherent and goal directed. R.806. She further noted that Plaintiff's memory skills appeared to be mildly impaired, but her insight and judgment were good. R.807.

### C.    Plaintiff's Activities of Daily Living.

The Administrative Record also reflected Plaintiff's activities of daily living, as reported by Plaintiff to her providers and directly to the Social Security Administration. For example, in her Function Report, Plaintiff noted that although she has no problems feeding herself or using the toilet, she is "frequently too tired to cook," and other activities, such as dressing and bathing take "longer to complete." R.305. Plaintiff also reported that that she and her husband share duties for caring for her pets and other household chores. R.305. For example, she stated that she used to be able to complete five loads of laundry, clean the home, and buy groceries once a week, but now

her husband helps more and groceries are delivered. R.305. She reported that reading, cooking, drawing, hiking, walking, knitting, gardening, and traveling are some of her hobbies, but her ability to do these things depends on the season and how she is feeling because everything takes longer. R.308. Finally, she noted that she cannot stand for long periods of time or walk more than half a mile without rest. R.309.

During the hearing before the ALJ, Plaintiff described some of these same activities. For example, Plaintiff confirmed that she used to walk her dog two to three miles a day, but now she gets short of breath and must sit down for 20 minutes halfway through the walk. R.50 (noting that she "just can't do, I can't do it anymore."). She testified that she tries to get aerobic exercise every couple of hours for five or ten minutes, but notes that if she overdoes it, her body "just shuts down." R.50. Plaintiff further testified that on some days she can get a fair amount of cleaning or housework done, but on other days just getting out of bed is an accomplishment. R.52. She stated that sometimes she can rest for 20 minutes and then work on something physical for 10 or 15 minutes, and then rest again. R.52-53 (reporting how she gets the house cleaned).

The record further confirms that Plaintiff reported these same activities to her medical providers. For example, during a visit in February 2019, Dr. Stabler noted that Plaintiff "states the fatigue is getting worse," and that she "[h]ad been able to complete a 3-5 mile walk without [a] problem, [but] now gets shortness of breath by 2 miles and has to stop and wait to resume." R.427. Dr. Stabler also noted that "[r]eading exhausts her," and just "4 hours of work wipes her out and she has to nap for hours to recover." R.427. During a May 2019 visit, Dr. Stabler continued documenting these reports, noting that Plaintiff must "pace herself" to complete light housework and gardening. R.420. Indeed, during a July 2020 visit, Plaintiff reported to Dr. Stabler that "[i]f she overdoes it such as gardening or travel she finds herself spending the next whole day trying to

recover." R.1083. Indeed, Plaintiff sometimes cancelled her medical appointments with Nurse Ramsey after working for four hours, citing her persistent fatigue. R.611

### D.    The ALJ's Decision.

The ALJ evaluated Plaintiff's claims using the five-step sequential analysis set forth in the Social Security regulations.[6] Beginning at step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since August 31, 2018, the alleged onset date R.17. The ALJ specifically noted although she earned several thousand dollars in 2018 through portions of 2019, her employer reported that she "did not complete all the usual duties of her position, was not able to complete all the job duties without special assistance, and was no more than 50% productive as similar employees with similar pay rates." R.17. As such, the ALJ treated this as "subsidized work." R.17.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: depression and post-traumatic stress disorder. R.18. (citing 20 C.F.R. § 404.1520(c)). The ALJ further explained that the "record shows the [Plaintiff] has a history of hypercholesterolemia, horseshoe tear of right retina, vitreous degeneration, cataracts, degenerative disc disease of the thoracic spine, carpal tunnel syndrome, kidney stone, obesity, and prediabetes." R.18 (citations omitted). However, the ALJ explained that "[t]here is little evidence of record [that] these impairments more than minimally limit the [Plaintiff's] ability to perform sustained work tasks,"

---

[6]    The sequential analysis requires the ALJ to evaluate (1) whether claimant's work, if any, qualifies as "substantial gainful activity"; (2) whether the claimant's medically determinable impairments are severe; (3) whether any of the claimant's impairments "meet or equal the requirements for impairments listed in the regulations"; (4) whether the claimant is able to perform "past relevant work" considering her residual functional capacity; and (5) whether the claimant can adjust to other work considering her residual functional capacity, age, education, and work experience. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201-202 (3d Cir. 2019) (citing 20 C.F.R. § 416.920(a)(4)(i)-(v)). The claimant has the burden of proof at steps one through four, and then at step five, the burden shifts to the Commissioner of Social Security. *Id.* at 201.

and therefore, found these conditions are "non-severe impairments" R.18. The ALJ also noted that Plaintiff "was suspected of having an autoimmune disease," but that her rheumatologist stated in December 2019 that there was no clear evidence for such disease, and the numbness in her legs had been resolved. R.18 (citation omitted). Therefore, any purported autoimmune condition was not a "medically determinable impairment." R.18.[7]

Moving on to step three, the ALJ concluded that none of Plaintiff's severe impairments alone, or in combination, met or medically equaled the requirements of the impairments listed in the regulations. R.18-19. Specifically, the ALJ compared Plaintiff's impairments to the listings in Sections 12.04 ("Depressive, bipolar and related disorders") and 12.15 ("Trauma-and stressor-related disorders"). R.18-19. In doing so, the ALJ twice referred to Plaintiff's activities of daily living, noting that she "helps care for four dogs, reads, and can prepare meals and shop in stores," which implied she can concentrate, persist, and maintain pace. R.19 (also noting that Plaintiff "can sometimes prepare simple meals, do laundry, dust, vacuum, shop online, and manage money," as evidence of her ability to adapt and manage oneself).[8]

Before reaching step four, the ALJ considered Plaintiff's RFC,[9] ultimately determining that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels[10] and she has the mental capacity for simple, repetitive, and routine tasks; and cannot work

---

[7]    At step two, the ALJ did not once refer to Plaintiff's generalized fatigue diagnosis, as noted by Dr. Kneifati and her treating providers.

[8]    Again, at step three, the ALJ did not refer to Plaintiff's generalized fatigue diagnosis.

[9]    Residual functional capacity, or RFC, is defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).

[10]    The regulations define physical exertion requirements at the sedentary, light, medium, heavy, and very heavy work levels. 20 C.F.R. § 404.1567(a). For example, "sedentary work involves lifting no more than 10 pounds at a time," whereas "very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." *Id.*

at a production rate pace." R. 20. After briefly summarizing Plaintiff's testimony, the ALJ explained that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R.20. According to the ALJ, "[l]ongitudinal treatment notes do not support [Plaintiff's] allegations," because these notes "generally show [Plaintiff] is fully oriented, alert, and cooperative with normal mood, appropriate affect, good eye contact, intact expressive and receptive skills, normal behavior, appropriate manner, coherent and goal directed thought processes, intact fund of knowledge, intact reality testing, intact decision-making capacity, fair insight, and good judgment." R.21 (citations omitted). In April 2020, the ALJ also noted that Plaintiff's primary care provider observed that her "fatigued [sic] reduced." R.22 (citing 12F/4).

The ALJ next explained that Plaintiff's "activities of daily living are also inconsistent with her allegations." R.22. Again, the ALJ noted that Plaintiff stated she helps care for her four dogs and can sometimes prepare simple meals, do laundry, dust, vacuum, drive, shop online, and manage money. R.22. The ALJ also explained that during an October 2019 internal medicine consultative examination, Plaintiff reported that she cooks two to three times a week, shops weekly, showers and dresses daily, listens to the radio, reads, and uses social media online. R.22 (citing 9F/4).[11]

The ALJ repeatedly cited to these same activities to assess the persuasiveness of the medical opinion evidence. For example, when assessing Nurse Hartman's claim that Plaintiff

---

[11]     Of course, and as discussed above, Plaintiff consistently reported that she engaged in certain activities, but they were hampered by her fatigue. For example, during a July 2020 visit, Plaintiff reported to Dr. Stabler that "[i]f she overdoes it such as gardening or travel she finds herself spending the next whole day trying to recover." R.1083. The ALJ did not once acknowledge these restrictions.

cannot work for more than one to two hours, the ALJ found the statement to be unpersuasive, in part, because it is inconsistent with Plaintiff's activities of daily living. R.23. The ALJ also discounted Dr. Kneifati's and Dr. Stabler's statements concerning her physical limitations for similar reasons. R.23-24. However, the ALJ found Dr. Henderson and Dr. Clark's statements to be persuasive, "[i]sofar as they state the [Plaintiff] has no physical limitations" because they are consistent with her activities of daily living. R.23.[12]

At step four, the ALJ found that given Plaintiff's RFC, she could not perform any past relevant work. R.26. The ALJ then proceeded to step five and identified multiple jobs in the national economy that Plaintiff could perform, including laundry laborer, machine feeder, and dining room attendant. R.27. As such, the ALJ concluded that Plaintiff was not disabled as that term is defined by the Social Security Act. R.27

## II.   STANDARD OF REVIEW

Judicial review of a social security disability determination is "limited." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The agency's factual findings are "conclusive," and therefore must be upheld, if they are supported by "substantial evidence." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). Substantial evidence is not a demanding standard. *Id.* at 1154. All it means is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1153 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This is "more than a mere scintilla but may be somewhat less than a

---

[12]     However, and as discussed above, both Dr. Henderson and Dr. Paul opined that Plaintiff had exertional limitations, even if they were not as restrictive as those noted by Dr. Stabler, Nurse Hartman, and Dr. Kneifati. Both Dr. Henderson and Dr. Paul opined the Plaintiff could occasionally lift and/or carry up to 50 pounds and to stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday. R.73-74, 92. Moreover, the ALJ entirely failed to address Nurse Ramsey's statement concerning Plaintiff's medical condition.

preponderance of the evidence." *Rutherford*, 399 F.3d at 552 (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). In applying this deferential standard of review, the Court "must not substitute [its] own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford*, 399 F.3d at 552). In other words, the Court must not re-weigh the evidence before the ALJ, but instead must assess whether substantial evidence supports the ALJ's findings. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations.").

In doing so, the Court determines whether the ALJ's decision "meets the burden of articulation demanded by the courts to enable informed judicial review." *Kenyon v. Saul*, No. 1:20-CV-1372, 2021 WL 2015067, at *5 (M.D. Pa. May 19, 2021). In this regard, the ALJ need not "employ particular 'magic' words" or "adhere to a particular format in conducting his analysis." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Jones v. Barnhart,* 364 F.3d 501, 505 (3d Cir. 2004)). The Court requires—at the very least—that the ALJ "set forth the reasons for [their] decision." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

## III.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on three grounds. First, she contends that the ALJ did not once mention her generalized fatigue disorder in his step two findings, gave little attention to it in his analysis of the record, and most importantly, neglected to include any related restrictions in his RFC determination that offered no physical limitations whatsoever. *See* Doc. No. 9 at 4. Given this, Plaintiff argues it is impossible to know whether the ALJ even considered this condition, thus thwarting any meaningful judicial review of the Decision. *Id.* Next,

Plaintiff contends that the ALJ failed to properly analyze the medical opinion evidence, which consistently documented greater limitations than that accounted for in the RFC determination. *See id.* at 5-21. According to Plaintiff:

> That the ALJ's rejection of the opinion evidence rests on impermissible lay speculation is also revealed by the fact that none of her providers, nor any reviewing or examining physician, suggested that she, a woman approaching retirement age (60+) with extreme fatigue, cognitive difficulties, and myalgias, could perform a *full range of exertional work*, i.e., no limitations on her physical lifting, carrying walking, and standing abilities.

*Id.* at 19 (emphasis in original). Finally, Plaintiff argues that the ALJ selectively cited to her activities of daily living without at all considering them in the context of her fatigue, which paints an inaccurate impression of her capabilities and distorts the record. *See id.* at 19, 21-28.

In response, the Commissioner does not directly confront these challenges, choosing instead to hide behind the largely deferential standard of judicial review recited above. According to the Commissioner, "[t]he ALJ fully accounted for Plaintiff's functional limitations related to her fatigue and cognitive decline by specifically limiting Plaintiff to performing simple, repetitive, and routine tasks and no work at a production rate pace." *See* Doc. No. 11 at 5 (citing R.20). In doing so, the Commissioner largely parroted the findings of the ALJ, and did not respond to Plaintiff's claims that the ALJ ignored the physical limitations that were consistently noted by her treating providers, and that the ALJ mischaracterized the extent to which she engages in certain daily activities.

The Court agrees with Plaintiff that the ALJ's Decision is flawed in several important respects. First, it is apparent that the ALJ did *not* consider Plaintiff's generalized fatigue diagnosis in his step two findings. As described at length above, Plaintiff's fatigue challenges were well-documented in the Administrative Record. Plaintiff's treating providers consistently described these concerns, even if there was no clear diagnosis or determined cause. For example, Plaintiff's

treating therapist, Nurse Ramsey, specifically noted that Plaintiff's "energy level is extremely low," but was "unsure if this is due to psychiatric or physical illness." R.1283.[13] Even the Administration's own consultative examiner, Dr. Kneifati, included "generalized fatigue" among Plaintiff's multiple diagnoses. R.786.

Despite this, the ALJ did not once refer to Plaintiff's fatigue at step two, choosing instead to focus on her depression and post-traumatic stress disorder, among several other "non-severe" impairments (e.g., cataracts, carpal tunnel syndrome, etc.). R.18. The ALJ acknowledged that Plaintiff "was suspected of having an autoimmune disease," but ultimately concluded such a condition was not a "medically determinable impairment" citing a December 2019 statement from Plaintiff's rheumatologist. R.18 (citing 12F/10). It is possible that the ALJ viewed Plaintiff's fatigue as somehow linked to this purported autoimmune condition. But without further explanation, the undersigned cannot now speculate as to what the ALJ was thinking. Rather, it was incumbent upon the ALJ to explain his rationale in order to permit meaningful judicial review of the Decision. *See Kephart v. Richardson*, 505 F.2d 1085, 1090 (3d Cir. 1974) ("It is incumbent upon the examiner to make specific findings—the court may not speculate as to his findings."); *Cordero v. Kijakazi*, 597 F. Supp. 3d 776, 786 (E.D. Pa. 2022) ("An ALJ must provide sufficient detail in his opinion to permit meaningful judicial review") (citing *Burnett*, 220 F.3d at 120); *Rivera v. Astrue*, 9 F. Supp. 3d 495, 506 (E.D. Pa. 2014) (holding the court cannot speculate why the ALJ failed to acknowledge certain evidence, stating, "[o]ur review of the ALJ's decision is confined to the record upon which it was based.") (citations omitted); *Schwartz v. Halter*, 134 F.

---

[13]    Tellingly, the ALJ did not once mention therapist Ramsey's opinion in his Decision.

Supp. 2d 640, 659 (E.D. Pa. 2001) ("[W]e [the court] cannot rely on our speculation as to how the ALJ reached his conclusion.").[14]

The Court further agrees with Plaintiff that the ALJ's RFC determination, which includes *no* physical limitations whatsoever, is not supported by substantial evidence. As noted above, the medical opinions of record *all* describe greater and more detailed physical limitations than those accounted for in the ALJ's RFC finding. Dr. Stabler, Nurse Hartman, Nurse Ramsey, Dr. Kneifati, Dr. Gavazzi, Dr. Fink, Dr. Henderson, Dr. Clark, and Dr. Blackmer *all* opined that Plaintiff had exertional limitations of some kind, even if they did not unanimously agree on the extent of those limitations. For example, Dr. Stabler opined that Plaintiff can only occasionally lift up to 10 pounds, sit for four hours, stand for two hours, and walk for less than one hour, R.1295-1296, whereas Dr. Henderson and Dr. Paul opined that Plaintiff could occasionally lift and/or carry up to 50 pounds and stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday. R.73-74, 92. Although the ALJ found some opinions more persuasive than others, no provider expressed that Plaintiff could engage in a full range of exertional work free of any limitations.[15]

---

[14]    The Court recognizes that the failure to mention a claimant's alleged impairment at step two of the analysis does not, by itself, warrant remand.  *See Rutherford*, 399 F.3d at 553. But as explained further below, the ALJ committed reversible error in several other respects.

[15]    The remaining two providers, Dr. Givens and Dr. Ledermann, expressed no opinion on Plaintiff's physical limitations (or lack thereof). Given this, Plaintiff understandably cited to *Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986) given its stark similarities to the instant matter. The ALJ in *Doak* concluded that the claimant had the RFC to perform light work. *Doak*, 790 F.2d at 27. However, the Third Circuit explained that "[t]he record does not support a finding that claimant could do light work as defined in the regulations." *Id.* at 29. The court observed that "[o]ne physician believes Doak is totally disabled, another said he could do sedentary work, and a third made no conclusion about ability to work. . ." *Id.* In other words, "[n]o physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore, the ALJ's conclusion that he could is not supported by substantial evidence." *Id.*

However, many district courts read *Doak* quite narrowly and reject the view that *Doak* created a requirement that there must be a medical opinion in the record that supports each limitation in the RFC. *See, e.g., Doty v. Colvin*, No. CIV.A. 13-80-J, 2014 WL 29036, at *1 (W.D.

Given this, the ALJ's RFC finding appears to be predicated on his own independent interpretation of the medical evidence and his assessment of Plaintiff's activities of daily living. In this regard, the Commissioner emphasized that the ALJ appropriately relied on the treatment notes, which showed that Plaintiff "generally had a normal gait, normal strength, regular heart rate and rhythm, normal respiratory effort, normal muscle bulk and tone, normal and equal deep tendon reflexes, intact cranial nerves, and mostly intact sensation." *See* Doc. No. 11 at 2, 11 (citations omitted). The Commissioner further argued that "Plaintiff's daily activities were also inconsistent with disabling limitations," given that she cared for her dogs, could sometimes prepare simple meals, did laundry, dusted, and vacuumed, among other things. *Id.* at 2

But these arguments are unavailing. To be sure, "there is no categorical rule that an ALJ's RFC finding must be based on a medical opinion." *Miller v. Berryhill*, No. 3:17CV1452, 2019 WL 3776662, at *4 (M.D. Pa. Aug. 12, 2019). However, the Third Circuit has consistently warned that an "ALJ may not make speculative inferences from medical reports," and is "not free to employ [his] own expertise against that of a physician who presents competent medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citations omitted); *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (observing that an ALJ may not reject a treating physician's opinion outright due to "his or her own credibility judgments, speculation or lay opinion."). In

---

Pa. Jan. 2, 2014). These cases frequently observe that in *Doak*, the record was sparse, and given this context, *Doak* simply reaffirmed the long-standing principle that the RFC determination must be supported by substantial evidence. *See, e.g., Cummings v. Colvin*, 129 F. Supp. 3d 209, 215 (W.D. Pa. 2015). Indeed, the Third Circuit in a non-precedential opinion has since explained that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).

But as explained more fully below, remand is warranted for several reasons beyond the Court's observation that none of the eleven medical providers of record suggested that Plaintiff could engage in a full range of work with no exertional limitations.

other words, an ALJ does not have "free reign to ignore medical evidence, as there is an undeniable medical aspect to an RFC determination." *Miller*, No. 3:17CV1452, 2019 WL 3776662, at *4. As one district court explained, "an ALJ must proceed with caution when affording no weight to all medical opinions in the record, relying solely on lay interpretation of medical evidence." *Id.* (citing *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (observing that the ALJ referred to clinical tests to support its conclusion, but did not address the symptoms that the treating physicians credited)).

Such caution was lacking here. As an initial matter, the ALJ completely ignored the medical opinion of Plaintiff's treating therapist, Nurse Ramsey. The Commissioner insists that this oversight was harmless, arguing that the ALJ already evaluated other opinions that were similar to Nurse Ramsey's statements, and thus remand would be futile. *See* Doc. No. 11 at 11. However, the Third Circuit has made clear that, "[i]n making a residual functional capacity determination, the ALJ must consider all evidence before [her]." *Burnett*, 220 F.3d at 121 (citation omitted). Indeed, the ALJ "must give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence." *Id.* (citing *Plummer*, 185 F.3d at 429; *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Batista v. Astrue*, No. 09-3757, 2011 WL 1044923, at *6 (E.D. Pa. Mar. 22, 2011) (advising that when a court "cannot determine if relevant unmentioned evidence was dismissed as not credible or simply ignored during review, a remand is appropriate"). And in this case, had Nurse Ramsey's opinion been considered, the ALJ may have found it to be consistent with the other opinions of record, and thus more persuasive. *See* 20 C.F.R. § 404.1520c(c) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

This oversight was just one of several errors. After citing to the longitudinal treatment notes, the ALJ explained that Plaintiff's primary care provider observed her in April 2020 and noted that her "fatigued [sic] reduced." R.22 (citing 12F/4). But this observation completely mischaracterizes the treatment notes. Following an April 27, 2020 visit, Dr. Stabler reported that Plaintiff "feels that she is mostly status quo regarding her fatigue reduced 6 processing exercise tolerance insomnia and tremors." R.831 (verbatim, with typos). While the phrase "fatigue reduced" is included in these notes, it is apparent that there are several typos, which include missing commas and other punctuation marks. Upon reading the notes more closely, it becomes clear that Dr. Stabler was *not* reporting any improvement. Dr. Stabler stated that Plaintiff's "day begins variably but usually she may have up to 4-6 hours of somewhat productive time before she develops *overwhelming fatigue* and collapses into his sleep that may last 2+ hours." R.831 (verbatim, with typos) (emphasis added). The notes explained, "[w]hen she awakens she has never back at baseline and is somewhat purposeful for an hour and a half so." R.831 (verbatim, with typos). These notes also reflected ongoing challenges with exercise, noting that Plaintiff is unable to take long walks. R.831. Contrary to the ALJ's suggestion, nothing about these notes suggested that Plaintiff's fatigue had improved or was "reduced." If anything, these notes documented the same ongoing challenges that Plaintiff reported to her doctors and to the Administration throughout these proceedings. "Mistakes and factual errors are not substantial evidence to support an ALJ's decision." *Gleason v. Saul*, No. 19-CV-03713-RAL, 2020 WL 1975378, at *6 (E.D. Pa. Apr. 24, 2020) (citing *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008)); *see also*

*Rodriguez v. Colvin,* No. CV 16-4322, 2018 WL 1474073, at *4 (E.D. Pa. Mar. 23, 2018) ("Courts have concluded that substantial evidence cannot be based on factual errors.")

The ALJ compounded this issue further by selectively—and misleadingly—citing to the record as it concerns Plaintiff's activities of daily living. Plaintiff, to her credit, consistently reported her activities and their concomitant restrictions to her medical providers and to the Social Security Administration. For example, Plaintiff testified during the hearing that she used to walk her dog two to three miles a day, but now she gets short of breath and must sit down for 20 minutes halfway through the walk. R.50 (noting that she "just can't do, I can't do it anymore."). She had previously expressed these same concerns to her primary care provider. R.427 (during a visit in February 2019, Dr. Stabler noted that Plaintiff "states the fatigue is getting worse," and that she "[h]ad been able to complete a 3-5 mile walk without [a] problem, [but] now gets shortness of breath by 2 miles and has to stop and wait to resume."). But the ALJ did not once refer to Plaintiff's reported limitations despite using her activities of daily living to either discredit the medical opinion evidence or her own credibility. District courts in this circuit, and across the country, consistently admonish ALJs who "cherry pick" the evidence in this manner. *See Stoltzfus v. Berryhill*, No. CV 16-6308, 2019 WL 1981888, at *5 (E.D. Pa. May 1, 2019) ("The ALJ need not make reference to every relevant note in the record, but the ALJ may not 'cherry-pick' results that support his conclusion and ignore those that do not."); *Piper v. Saul*, No. CV 2:18-1450, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings."); *see also Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020) (same). Indeed, an analysis based on "mischaracterizations of the evidence cannot provide substantial evidence to find that a claimant's complaints . . . are not credible." *Coniglio v. Colvin*, No. CV 15-40, 2016 WL 4385870, at *9 (E.D.

Pa. July 26, 2016), *report and recommendation adopted*, No. CV 15-40, 2016 WL 4270334 (E.D. Pa. Aug. 15, 2016).

In light of these errors, the Court finds that the ALJ's Decision is not supported by substantial evidence. On remand, the ALJ must consider Plaintiff's generalized fatigue disorder, starting at step two and continuing through the subsequent analysis as appropriate. The ALJ should also consider, during the RFC analysis, Nurse Ramsey's opinion. Finally, any analysis of Plaintiff's activities of daily living should not be limited to only the evidence that supports the ALJ's ultimate conclusion.

## IV.    CONCLUSION

For the reasons explained above, Plaintiff's request for review is **GRANTED**. The Court finds that the ALJ's decision is not supported by substantial evidence. As such, the final decision of the Commissioner of Social Security is **VACATED,** and this matter is **REMANDED** for further proceedings in accordance with this opinion**.** An appropriate Order follows.


                                        BY THE COURT:


                                        *s/Pamela A. Carlos*
                                        PAMELA A. CARLOS
                                        U.S. Magistrate Judge